IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHNNY GRAVES,

    Petitioner,                  No. CIV S-03-2607 GEB GGH P

  vs.

JAMES YATES, Warden, et al.,

    Respondent.              <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2002 conviction for assault with means of force likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)), a gang enhancement (Cal. Penal Code § 186.22(b)(1)) and two prior conviction enhancements (Cal. Penal Code § 667, 1170.12.). Petitioner is serving a sentence of nine years.

      Petitioner challenges his conviction on the following grounds: 1) violation of the Confrontation Clause; 2) insufficient evidence; 3) trial court erred in denying his motion to substitute counsel. After carefully considering the record, the court recommends that the petition be denied.

/////

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The AEDPA applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the

objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

In reviewing a state court's summary denial of a habeas petition, the court "looks through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000)(citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S.Ct. 2590 (1991)). In the instant case, the California Supreme Court issued a summary denial of petitioner's petition for review, which raised the claims raised in the instant petition. Respondent's Answer, Exhibit F. Accordingly, the court looks through to the reasoned decision of the California Court of Appeal.

/////

/////

III. Factual Background

      Sacramento Police Officer Christian Prince testified that on November 10, 2001, at 11:40 p.m. he responded to a call at the Quick Stop Market at 3296 Marysville Boulevard. RT at 176. When he arrived, Officer Prince observed a man who identified himself as Richard Connor standing in front of the market dressed primarily in red. RT at 176, 177. He had cuts on his face and blood was splattered on him. RT at 176. Connor told Prince that four Crips had walked up to him, asked him where he was from and then started beating him up. RT at 179. Connor said he did not want to report anything. RT at 179. He just wanted a medic. RT at 179. Connor would not give Officer Prince any additional information about the suspects. RT at 179. Officer Prince testified that inside the store a display rack was knocked over and there was blood on the floor. RT at 178.

      The court played for the jury the videotape taken from the market on the night of the incident. RT at 186.

      Sacramento Police Department Detective Laura Gracia testified that the Quick Stop Market where the assault occurred was part of the turf of the Nogales Gangster Grips. RT at 192. The Crips claim blue as their identifying color. RT at 195. Persons associated with the Blood gang wear red clothing. RT at 196.

      Gracia testified that she observed tattoos on petitioner that were indicative of membership in the Crips. RT at 211. Gracia also spoke with a gang expert in San Bernardino County who told her that petitioner was a validated gang member of the Pimp Player Hustler Gangster Crips out of San Bernardino. RT at 212. She testified that petitioner's gang name was "jack move." RT at 213. In 1998 petitioner told Gracia that he was a member of the Crips. RT at 214.

      Gracia watched the videotape taken from the store of the crime. RT at 215-216. She recognized petitioner on the tape. RT at 216. Gracia testified that she believed that the purpose of the assault on Connor was to benefit the Crips. RT at 217. The basis of this opinion

4

was that the victim was dressed from head to toe in red, which was indicative of membership in the Bloods gang. RT at 217. In addition, the area where the assault occurred was a Crips area. RT at 218. Gracia identified the other assailants as Kenyata Hudson and Lamont West, petitioner's brother, both validated Crips members. RT at 219.

Dr. Hallam who worked in the emergency room at Sutter Hospital testified that he examined Connor on the night of the assault. RT at 232. Connor told Hallam that he had been jumped by gang members and struck on the left side of the face with a soda can. RT at 232. Hallam testified that Connor had a laceration near his cheek and discomfort in his shoulder area. RT at 232, 233. The laceration on Connor's cheek was half an inch. RT at 233. Hallam closed it with five stitches. RT at 233.

Against the advice of counsel, petitioner testified. Petitioner testified that he went to the Quick Stop Market to get gas. RT at 292-293. At that time, he was with Larry, whose last name he did not recall. RT at 296, 305. Petitioner saw Connor walk into the store. RT at 295. As petitioner went to get into his car, Connor walked toward him and said something to petitioner. RT at 297. Connor insisted that petitioner was somebody else and then took a swing at him, hitting petitioner in the face. RT at 297-98. Petitioner swung back at Connor and chased him into the store. RT at 299. Petitioner testified that he did not know Kenyata Hudson, who Detective Gracia had identified on the tape. RT at 300. Petitioner testified that his brother was not at the store on the night of the incident. RT at 301.

Petitioner testified that he did not ask Connor where he was from, as testified by Officer Gracia. RT at 302. Petitioner denied that his actions toward Connor were gang related. RT at 303. During the course of the incident, petitioner felt that he was defending himself. RT at 304.

On cross-examination, petitioner was asked if he saw in the video taken from the market himself and the other two men involved in the beating jump into his car and take off. RT at 306. Petitioner denied that the video depicted this scene. RT at 307. During cross-

1 examination, petitioner testified that some man he did not know joined in with him on the assault
2 of Connor. RT at 307. Petitioner did not deny that he had previously been involved in the Crips.
3 RT at 308.

4 On cross-examination, petitioner was asked whether Connor was trying to hold
5 the door of the store closed as petitioner and the other two men tried to push open the door, as
6 apparently depicted on the video. RT at 316. Petitioner testified that only he was trying to push
7 the door open. RT at 316. Petitioner testified that he wanted to get into the store to hit Connor in
8 retaliation for Connor hitting him. RT at 316. Petitioner testified that he was the only person
9 who inflicted any injuries on Connor. RT at 320.

## IV. Discussion

### A. Confrontation Clause

The trial court admitted Connor's statements to Dr. Hallam and Officer Prince pursuant to Cal. Evid. Code § 1170, which permits unavailable witness's statements to be introduced at trial if the statement describes the infliction of an injury, was made at or near the time of the injury, and was made to a physician or law enforcement officer. Answer, Exhibit D, pp. 6-7. Petitioner argues that admission of Connor's statements violated the Confrontation Clause.

Pursuant to the Confrontation Clause, and subject to the Crawford case below, hearsay is admissible when the statement bears "indicia of reliability" and the witness is "unavailable." Ohio v. Roberts, 448 U.S. 56, 63, 100 S. Ct. 2531, 2537 (1980). Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception or the evidence bears particularized guarantees of trustworthiness. Id. at 68, 100 S. Ct. at 2540.

In Crawford v. Washington, 541 U.S. 36, 59-60, 124 S. Ct. 1354, 1369 (2004), the Supreme Court held that testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable and only where the defendant has had a prior opportunity to

\\\\\

cross-examine.[1]  For the following reasons, the court finds that <u>Crawford</u> is not applicable in the instant case because the statements made by Connor to Dr. Hallam and Officer Prince were not testimonial.

In <u>Crawford</u>, the Supreme Court declined to define what constitutes testimonial evidence.  However, it did give some examples of what would constitute testimonial evidence:

> An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.  The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.
>
> Various formulations of this core class of "testimonial" statements exists: "ex parte in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements...contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," <u>White v. Illinois</u>, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992)(Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,"...

541 U.S. at 51-52, 124 S. Ct. at 1364.

Connor's statements to Dr. Hallam were not made under circumstances which would lead an objective witness to reasonably believe that the statements were made for testimonial purposes.  See <u>Evans v. Luebbers</u>, 371 F.3d 438, 445 (8th Cir. 2004) (hearsay statements admissible as statements for purposes of obtaining medical diagnosis and as evidence of mental state are not testimonial for purposes of <u>Crawford</u> analysis).  Petitioner's statements to Officer Prince were not testimonial because "voluntary statements made by a victim to police, without the stress of interrogation, are not testimonial for purposes of <u>Crawford</u>.  <u>Leavitt v. Arave</u>, 383 F.3d 809, 830 n. 22 (9th Cir. 2004).  For these reasons, <u>Crawford</u> is inapplicable.

---

[1] In <u>Bockting v. Bayer</u>, 399 F.3d 1010, 1012-1013 (9th Cir. 2005), as amended on denial of rehearing, ___ F.3d ___, 2005 WL 1278821 (9th Cir. June 1, 2005), the Ninth Circuit held that <u>Crawford</u> applies retroactively.  A petition for hearing en banc is pending in <u>Bockting</u>.

Applying the test set forth in Ohio v. Roberts, the court first considers whether Connor was unavailable. A witness is considered unavailable if "the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Barber v. Page, 390 U.S. 719, 725, 88 S. Ct. 1318, 1322 (1968). "The lengths to which the prosecution must go to produce a witness...is a question of reasonableness." Ohio v. Roberts, 448 U.S. 56, 74, 100 S. Ct. 2531, 2543 (1980). Petitioner argues that Connor was not unavailable because the prosecution did not make a good faith effort to locate him.

Before admitting Connor's statements, the trial court held a hearing to determine what steps the prosecution had taken to locate Connor. At this hearing, Todd Stewart, a process server for the Sacramento County District Attorney's Office, testified regarding his efforts to locate Connor. Stewart testified that Connor was a transient. RT at 57. The only information he had was Connor's birthday. RT at 57. He began his search for Connor by checking "known persons," a computer system in the district attorney's office that identifies persons with contact with law enforcement. RT at 58. "Known persons" contained an address for Connor on Dry Creek Road. RT at 58. When Stewart went to this address, he found a vacant house. RT at 58-59.

Stewart next checked with the Sacramento Municipal Utility District (SMUD) and voter registration with no luck. RT at 59. Stewart checked the jails to see if Connor was in custody, which he was not. RT at 59. Stewart then checked with "known persons" again and found the name of Connor's mother, Kathy Connor. RT at 59-60. The record showed her address as the vacant house on Dry Creek Road. RT at 60. Stewart did a D.M.V. check on Kathy Connor and found that she had surrendered her license to the state of Michigan. RT at 60.

Because Connor was a transient, Stewart checked Loaves and Fishes to see if he had registered there at any time. RT at 60. Stewart checked welfare to see if Connor was receiving any aid. RT at 61. These checks were unsuccessful.

/////

The trial court questioned whether due diligence required the prosecution to search for Connor in Michigan. Answer, Exhibit D, p. 9. The court gave defense counsel one day to provide authority on this issue, which he did not do. Id.

The efforts described above demonstrate a good faith attempt by the prosecution to locate Connor. The court agrees with the California Court of Appeal that "[g]iven what little information was available, the prosecution actively attempted to locate the victim through the most likely resources available to it." Answer, Exhibit D, p. 11.

In his state appeal, petitioner argued that the prosecution should have searched the streets near the Quick Stop the victim allegedly frequented as a homeless transient. The state appellate court rejected this claim:

> However, nothing in the record indicated the victim frequented the Quick Stop. It was also reasonable for the prosecution to believe the victim, if he was a Blood, would likely not be seen on the streets of Crip turf after he had already been beaten and bloodied there once. The prosecution investigated locations and agencies that would likely have information on a transient. These efforts satisfied the requirements of due diligence.

Id.

For the reasons stated by the California Court of Appeal, the court finds that prosecution was not unreasonable for failing to search the streets near the Quick Stop for Connor.

The court now considers whether Connor's statements to Officer Prince and Dr. Hallam bore indicia of reliability. These statements were admitted pursuant to Cal. Evid. Code § 1370(a):

> (a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met:
> (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.
> (2) The declarant is unavailable as a witness pursuant to Section 240.
> (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.
> 4. The statement was under circumstances that would indicate its trustworthiness.
> 5. The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic or to a law enforcement official.

The only firmly rooted hearsay exception that has any similarity to § 1370 is for statements made for purposes of medical diagnosis or treatment. White v. Illinois, 502 U.S. 346, 356 n. 8, 112 S. Ct. 736, 742 (1992).[2] However, § 1370 does not fit squarely within this exception because not all statements admitted pursuant to this action are necessarily made for the purposes of medical diagnosis or treatment.

In any event, it is clear that Connor's statements to Dr. Hallam were made for purposes of medical diagnosis or treatment. Connor statements to Dr. Hallam were made at the hospital while he was describing how his injuries occurred. Accordingly, these statements bore indicia of reliability because they were admitted pursuant to a firmly rooted hearsay exception.

In contrast, Connor's statements to Officer Prince were not made for purposes of medical diagnosis or treatment. Rather, they were made in response to Officer Prince's informal questioning of Connor regarding the incident. Because these statements were not admitted pursuant to a firmly rooted hearsay exception, the court must determine whether they bore particularized guarantees of trustworthiness. The particularized guarantees of trustworthiness "must be shown from the totality of the circumstances..." Idaho v. Wright, 497 U.S. 805, 819, 110 S. Ct. 3139, 3148 (1990). The "relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." Id. There is no mechanical test for determining reliability nor a prescribed list of reliability elements, see Barker v. Mooris, 761 F.2d 1396, 1400-03 (9th Cir. 1985), and "courts have considerable leeway in their consideration of appropriate factors." Wright, 497 U.S. at 822, 110 S. Ct. at 3149. The reliability of the out-of-court statements cannot be established "by bootstrapping on the trustworthiness of other evidence." Id., at 823, 110 S. Ct. at 3150.

---

[2] Because § 1370 does not require statements to be made spontaneously, statements admitted pursuant to this section do not fall under the firmly rooted exception for spontaneous declarations. See Respondent's Answer, Exhibit D, p. 11-12 (§ 1370 is different from spontaneous declaration exception); White v. Illinois, 502 U.S. 346, 356 n. 8, 112 S. Ct. 736, 742 (1992) (spontaneous declaration exception is firmly rooted).

The California Court of Appeal found that Connor's statements were made under circumstances that indicated their trustworthiness:

> The statements were made at or near the time of the crime. They were not made while the victim was in custody or in response to leading questions. There was no evidence the victim was under the influence of alcohol or drugs when he made the statements.
>
> Moreover, the statements were not made in contemplation of pending or anticipated litigation in which the victim was interested. As we have already indicated, the victim impliedly expressed his desire that no action be taken against defendant by requesting no police report be taken. (Evid. Code, § 1370, subd. (b)(1).)

Respondent's Answer, Exhibit D, p. 15.

This court agrees with the reasoning of the California Court of Appeal that Connor's statements to Officer Prince were reliable. The most persuasive reason supporting this finding is Connor's desire for no police report to be taken.

For the reasons discussed above, the court finds that the admission of Connor's statements to Officer Prince and Dr. Hallam did not violate the Confrontation Clause. The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.

Even if admission of these statements violated the Confrontation Clause, any error was harmless. A Confrontation Clause violation is subject to harmless error analysis. Whelchel v. Washington, 232 F.3d 1197, 1205-1206 (9th Cir. 2000). The California Court of Appeal found that admission of the statements, if wrongly admitted, was harmless error:

> Even if the statements were wrongly admitted, we conclude it is beyond a reasonable doubt the outcome would not have been different had the statements not been admitted. (Chapman v. California (1967) 386 U.S. 18 [L.Ed.2d 705].) Defendant admitted he pursued the victim inside the Quick Mart with the intent to hit the victim back. The videotape shows the defendant acted on that intent with sufficient force. Detective Gracia's testimony established the crime was gang-related. The evidence was sufficient to establish the conviction.

Respondent's Answer, Exhibit D, pp. 15-16.

/////

The California Court of Appeal's harmless error determination was not contrary to established federal law. See Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004) (applying AEDPA standard to harmless error analysis).

For the reasons discussed above, petitioner's Confrontation Clause claim should be denied.

B. Insufficient Evidence

Petitioner alleges that there was insufficient evidence to support his conviction for assault likely to cause great bodily injury.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Under Jackson, the court reviews the entire record when the sufficiency of the evidence is challenged on habeas. Adamson v. Ricketts, 758 F.2d 441, 448 n. 11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts." Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could have reached the same conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). The fact that petitioner can construct from the evidence alternative scenarios at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable trier of fact could have found the conviction scenario beyond a reasonable doubt.

/////

> In reviewing the sufficiency of the evidence supporting a conviction, we search the record to determine "whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Douglass, 780 F.2d 1472, 1476 (9th Cir.1986). *The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict.* United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc). United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) (emphasis added).

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, __ F.3d __, 2005 WL 1301570 (9th Cir. 2005).

The California Court of Appeal denied this claim on the following grounds:

> "Section 245, subdivision (a)(1), punishes assaults committed by the following means: 'with a deadly weapon or instrument other than a firearm,' or by 'any means of force likely to produce great bodily injury.' One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on use of a deadly weapon or instrument or, alternatively, on force likely to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. (See People v. Wingo (1975) 14 Cal.3d 169, 176.) That the use of hands or fists alone may support a conviction of assault 'by means of force likely to produce great bodily injury' is well established (ibid.; People v. Armstrong (1992) 8 Cal.App.4th 1060, 1066; see People v. Duke (1985) 174 Cal.App.3d 296, 302-303 [when hands, fists and feet are employed in an assault, normally the charge will be assault with force likely to produce great bodily injury]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 420, p. 482)..." (People v. Aguilar (1997) 16 Cal.4th 1023, 1028, italics in original.)
>
> "Both the 'weapon or instrument' clause of the statute and the 'force likely' clause look to the probability or capability of producing great bodily injury." (People v. Aguilar, supra, 16 Cal.4th at p. 1033.) Witkin explains the relevance of the victim's actual injuries in determining whether the force used had the capability of producing great bodily injury. "[A]n assault or battery that does not result in any physical injury and does not come within the scope of any other felonious assault is unlikely to support anything more than a simple misdemeanor conviction....And the cases tend to bear out this assumption, for almost invariably they involve blows and physical injuries. If a deadly weapon is used to inflict them, the charge can be assault with a deadly weapon....But if hands, fists, feet, or the like are the

13

means employed, the charge will ordinarily be assault with force likely to produce great bodily injury. And the nature and extent of the injuries inflicted will often be the controlling factor in determining that the force used was of that character. (See People v. Schmidt (1944) 66 Cal.App.2d 253, 255 [woman choked, beaten on head and neck with fists]; People v. Carnavacci (1953) 119 Cal.App.2d 14, 16 [man struck with firsts on face and head, knocked down, kicked in back, stomach, and face, dragged from ground up against automobile bumper]; People v. Hooker (1955) 130 Cal.App.2d 687, 689 [kicks in stomach, back, and groin; blow on head with 14-inch long steel spring shaft]; People v. Kinman (1955) 134 Cal.App.2d 419 [woman hit in face and kicked; teeth loosened, eyes blackened, nose and eye cut, spine bruised]; People v. Pierre (1960) 178 Cal.App.2d 585, 588 [woman's arms pulled backward, both humeri fractured, head pounded on floor]; People v. Roberts (1981) 114 Cal.App.3d 960, 962 [kicks to head and torso causing cuts, bruises, large welt, and unconsciousness]; 5 A.L.R.5th 243 [sufficiency of bodily injury to support charge of aggravated assault].)" (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 37, p. 661.)

Here the evidence demonstrates defendant and his two accomplices hit the victim in the face with a soda can with sufficient force to cause a laceration requiring five stitches. They also hit him in the upper body with another object from behind. The video showed the victim being attacked by three persons, one of whom was identified as defendant, as they fell into a store display. This evidence constitutes substantial evidence in support of the jury determining the defendant assaulted the victim with force likely to cause great bodily injury.

Respondent's Answer, Exhibit D, pp. 16-17.

For the reasons stated by the California Court of Appeal, the court finds that there was sufficient evidence on which a reasonable jury could find petitioner guilty. Because the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

### C. Denial of Motions for Substitute Counsel

Petitioner argues that the trial court improperly denied his motions to substitute counsel, brought pursuant to People v. Marsden, 2 Cal.3d 118, 84 Cal.Rptr. 156 (1970). "[T]o compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of counsel whatsoever." Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970). "[I]t is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion, and that the matter be resolved on the merits before

the case goes forward." Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).

The trial court heard petitioner's first Marsden motion on April 9, 2002. Following discussions with the court and counsel, petitioner withdrew this motion. RT at 9. During further pretrial proceedings, petitioner later requested that he be permitted to represent himself. RT at 81-82. Petitioner withdrew this request after the court denied his request for a continuance. RT at 101.

Petitioner later made a second Marsden motion. RT at 121. At the hearing on this motion, petitioner told the court that he did not trust his lawyer, his lawyer did not tell him what was going on in the case and that they did not get along. RT at 123. In response, petitioner's counsel stated that petitioner tried to talk to him during voir dire, which made it difficult for him to focus on prospective jurors. RT at 124. Counsel also stated that while petitioner stated that what took place was an act of self-defense, counsel did not think that the jurors would believe that after watching the videotape. RT at 125. Counsel stated that he thought the better defense would be to argue that what happened was a misdemeanor rather than a felony. RT at 125. Counsel also stated that he advised petitioner not to testify because the jurors would then hear about his prior conviction. RT at 126.

Petitioner also objected that his counsel had failed to file a motion to suppress Connor's statements. RT at 131. The court told petitioner that his counsel had made all the motions he could regarding admission of Connor's statements. RT at 132. The court went on to discuss in more detail petitioner's version of events in more detail with counsel. RT at 134-136. Counsel again reiterated that he told petitioner that "self-defense is not going to fly in this case." RT at 136. Counsel also discussed how the investigation of the case did not support petitioner's version of events. RT at 136-137.

In denying the motion, the court told petitioner:

There's going to be plenty of time between today, Thursday, and when this case resumes on Monday for you and your attorney to sit down and talk about whether or not you're going to testify and more of the details about what you will be

> claiming happened and how that fits in with the videotape and so forth and his then recommendations about whether you should testify or not, and then you can decide whether to testify or not.
>
> The rest of what you have argued about not getting along with your attorney, those are not sufficient enough for me to grant your request to discharge Mr. Johnson.

RT at 148.

When petitioner protested that he did not trust his lawyer, the court told him,

> The mere fact that you cannot trust Mr. Johnson is not itself enough for me to remove Mr. Johnson. A lot of defendants have made that argument in a lot of <u>Marsden</u> motions. It depends upon what you base it on.

RT at 149.

During the prosecution's closing argument, petitioner sent the court which stated,

> Your Honor, I would like to get on the stand 'cause I want to defend my own butt. I never said I wasn't not [sic] going to get on the stand. My attorney is telling me now, but I want to. He's violating my rights.

RT at 258.

The court held a brief in camera hearing to discuss petitioner's complaint that his lawyer did not call the witnesses he wanted. RT at 267-270. At this hearing, petitioner complained that he wanted to view the videotape from the store at the jail where he could see it "up close." RT at 267. The court made arrangements for petitioner to view the tape at the courthouse "up close." RT at 267-268.

After the verdict, petitioner filed a writ with the court complaining, in part, about counsel's representation of him during trial. In this motion, petitioner again objected that the prosecutor had been permitted to introduce Connor's statements. RT at 409. Petitioner also complained that his counsel failed to make a <u>Wheeler</u> motion during jury selection. RT at 412.

The court held a brief in camera hearing regarding petitioner's writ. During this hearing, petitioner's counsel told the court that he had explained to petitioner how many challenges the prosecution got during jury selection. RT at 415. The court then explained to petitioner the jury selection process. RT at 417. After going back on the record and having

further discussion with the parties, the court denied the writ. RT at 422.

At his sentencing hearing, petitioner told the court that he wanted to fire his counsel. RT at 424. Petitioner claimed that his counsel had called him a "nigger," which counsel denied. RT at 424. The court denied petitioner's request. RT at 425.

The record indicates that the trial court held several hearings where petitioner's complaints regarding counsel were adequately explored. Petitioner's main conflict with his counsel concerned trial tactics as well as petitioner's misunderstanding of the law. This type of dispute is not sufficient to warrant substitution of counsel. See United States v. Corona-Garcia, 210 F.3d 973, 977 n. 2 (9th Cir. 2000) (explaining that even if the court were to conclude that a conflict with respect to trial tactics was severe, it would be "disinclined to reverse on that ground because trial tactics are clearly within the realm of powers committed to the discretion of defense counsel in any event") (citing United States v. Watsworth, 830 F.3d 1500, 1509 (9th Cir. 1987) ("[A]ppointed counsel, and not his client, is in charge of the choice of trial tactics and the theory of defense."). Moreover, the Sixth Amendment right to counsel does not guarantee a "meaningful relationship" between the accused and his counsel. Morris v. Slappy, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 1616 (1983).

At sentencing, petitioner accused his counsel of using a racial slur. The court questioned counsel regarding the incident and determined that it did not occur. Use of a racial slur by either a defendant or his counsel could result in an irreconcilable conflict. However, in the instant case, petitioner made his allegation after having been convicted and repeatedly complaining about counsel's trial strategy. The trial court apparently determined that petitioner's allegation was false and motivated by "sour grapes." These circumstances did not warrant appointing new counsel.

Because the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 7/1/05

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
gra2607.157